THE OLIVER.

*(District Court, E. D. Virginia.   January 10, 1885.)*

1. COLLISION—FAIR-WAY.
	A fair-way, in the sense of the tenth rule of navigation, is navigable water on which vessels of commerce habitually move.   As to vessels of light draught, it embraces water inside of buoys, where sail-vessels of light draught usually navigate, and not merely the ship-channel.

2. SAME—SCHOONERS—LIGHT—WATCH.
	A small schooner well loaded and lying deep in the water, with her stern up stream, in a line with the course of sail-vessels, and anchored in 12 feet of water, 125 yards inside of a buoy, with no light in the rigging and no watch on deck, was run into and sunk at 11 o'clock at night by another schooner sailing under a breeze from shore, as close to shore as practicable, all the latter vessel's crew being on deck, two of them in her bows, and no one seeing the schooner at anchor.   *Held,* that the moving schooner was not, and that the one at anchor was, in fault.

In Admiralty, in a cause of collision.

The facts of the case sufficiently appear in the opinion.

*J. A. Armstrong* and *C. E. Stuart,* for libelant.

*C. P. Meredith* and *Thomas Johnson,* for respondent.

HUGHES, J.   The schooner Mechanic was lying at anchor, when this collision occurred, in 11 or 12 feet of water, about two miles below Maryland Point, in the Potomac river, and about 125 yards inside the second red buoy below the Point.   The place where she was lying is shown by the chart to be in a line drawn from the first of these buoys to the mouth of Nanjemoy creek.   On this line the water is shown by the chart to be nowhere less than 8½ feet, and in much of the dis-

tance exceeds 15 feet, deep. When sail-vessels are running down the Potomac river under a stiff breeze from off the Maryland shore they hug the shore as nearly as practicable, and pass along the course indicated by this line. The schooner Mechanic was lying in the channel on this fair-way. The term "channel" sometimes refers to the current of a running stream, and means that part of the stream in which the current flows. But in tide-waters the term refers to the movement of vessels, and means that part of the water on which vessels move. A fair-way is water on which vessels of commerce habitually move. Buoys do not mark the limits of channel as to vessels of lighter draught. They are usually placed at the edge of that part of the channel in which the water is deep enough for vessels of large size, called the ship-channel. There is no law of navigation requiring vessels of light draught to move outside of buoys. The custom of sail-vessels of light draught is to get as near as practicable to the windward shore, and in doing so they habitually move inside of buoys. It is erroneous to speak of 10 or 12 feet of water, on which they habitually move, as *flats*. Nor are the sailing directions found in the official publications of the government laws of navigation. They are intended more especially for the guidance of masters who are unfamiliar with the waters described. They are advisory and not imperative as to vessels of light draught.

Capt. King, the master of the Mechanic, was familiar with the waters of the Potomac in the region of Maryland Point and Nanjemoy creek, and should have been familiar with the habit of the smaller class of sail-vessels, in coming down the Potomac under a stiff breeze from the Maryland shore, to run in tolerably close to shore. In anchoring his schooner in the course apt to be taken by such vessels, he took the risk of whatever might happen there through his fault. The tenth rule of navigation requires all vessels, when at anchor in roadsteads or fair-ways, to have a white light in the rigging, not more than 20 feet above decks, visible all around the horizon, and at a distance of not less than a mile. It was incumbent on Capt. King, when he anchored his schooner in the place which has been mentioned, to have such an anchor light in the rigging. His vessel was small, registered as of only 19 tons burden. He had 552 bushels, or 15 tons, of corn in the aft part of his hold, which put his stern deep in the water and brought his deck down close to the water. The tide was running flood, and his stern was thrown directly up stream in the course of vessels coming down the river, in such manner that they could not see his broadside. His sails being furled as he lay there, and the moon two hours high in the west, shining on his stern, and not casting a shadow behind it, he presented quite a small object to the vision of vessels coming from Maryland Point towards Nanjemoy creek. In anchoring in the probable course of such vessels, he took all the risks of accidents which might happen through his fault; for an admiralty court would not dare to set such

a precedent as to hold that if he had no anchor light up at such a place as the one described, he might recover damages for a collision. That would be setting a premium on acts inviting collisions. Under such a ruling, any man who had an old vessel too worthless to be insured, could get a price for her by putting her in a place where vessels were likely to sail, and, by leaving no light in her rigging at night, contriving to have her run over and sunk.

The schooner Wm. Oliver, of about 200 tons burden and five feet draught, was coming from Washington City under a strong wind from off the Maryland shore, and running in near shore on the night of the collision, which was the fifth of April. At about 12 o'clock or after, she came in collision with the Mechanic and sank her by running into her stern. Though the weight of testimony is that the Mechanic had an anchor light up as late as 11 o'clock, yet there is no evidence whatever that she had a light up at the time of the collision. The master of the Mechanic, and a colored man who was the only person with him on board, were at the time down in the cabin asleep. Capt. King was undressed and the negro partially so. The accident awakened them, and they were taken on board of the Oliver, the captain losing all his clothes but shirt and drawers. It is proved on the part of the Oliver that her entire crew, consisting of four men, were on deck; Capt. Jones, the master, being at the wheel, and the rest of the crew being in the starboard and port bows, or well forward. The mate was on the lookout. Three of this crew testified in the case, and all say that they did not see the Mechanic until the moment of collision, and that she had no light up. The witnesses of the libelants all say that the night was clear, that the moon was shining, and that objects on the surface of the water as large as boats could be seen at a considerable distance. The witnesses of the respondent say that there was a haze on the surface of the water at the time of the collision, and that objects could not be seen by them looking from the water towards the shore.

Two facts proved in regard to the Mechanic were—*First*, that she was 39 years old; and, *second*, that Capt. King, who was her owner, took no steps to get his vessel up after she was sunk, and manifested no concern for saving her, but allowed his vessel and her cargo to remain uncared for where they lay. Most of the rigging was saved, but this was more through the procurement of Capt. Jones than that of Capt. King. If the Mechanic had been anchored on the flats where vessels never passed, and had no light up, and the Oliver had, by any accident resulting from bad seamanship or fault, run over her, the case would have been different from that before us. The immediate cause of the accident would have been the unseamanlike act of the crew of the Oliver, and damages could have been awarded in spite of the want of a light on the Mechanic. Or, if the Oliver had seen the Mechanic where she lay without a light, and had not done all in her power to avoid a collision, then the last fault would have been the

Oliver's, and she would have been held responsible. Or, if the Mechanic had been tied up to a wharf and had been run into, the case would have been against the Oliver. Though it is better, even for vessels lying at wharves or out on flats, to have a light up, yet the absence of it would not excuse vessels running into them in such positions.

But the law of navigation which requires vessels lying at anchor *in a fair-way* to have a light up is imperative. It must be obeyed. It must be effectively obeyed. It will not do for the master to hang up a light after nightfall, and then go to bed, trusting to the moon to serve as a light, in the event that the winds or other cause shall put out the light. Obedience to this important requirement of law must be certain and unremitted. The master must know that the light is continually up. Conjecture will not do. When lying in a fair-way the anchor light must be known to be all the time up, and this cannot be with certainty unless a watch be kept on deck to keep it burning, and to be able to say positively that the light was up, in the event of a collision.

I do not know that there is any rule of navigation which requires a vessel at anchor to keep a watch on deck; but, rule or no rule, it is very careless for a vessel lying in deep water, in the course pursued by sailing vessels, not to have a watch on deck. See *The Sapphire*, 11 Wall. 164, and *The Petrel*, 6 McLean, 491. Her master, I repeat, must *know* that his light is up; and how can he know this himself, and how can he prove the fact to the satisfaction of a court, in the event he is struck by another vessel, unless he have a watch on deck to see that it does not go out? He assumes great risk if he neglects this precaution. The Mechanic has failed to prove that her light was up for an hour before and at the time of the collision. Lying, as she was, in a fair-way without a light, and presenting, as she lay, low down in the water, at midnight, but a small object to the vision of a vessel approaching her from her rear, she invited collision with no light up. The usual presumption of law, against the moving vessel, in favor of the one at anchor, is therefore reversed in this case, and the Mechanic must be held to have been in fault; for, to hold that a vessel lying where she was, without a light in the rigging or a watch on deck, was not in fault, would be to offer a premium for collision. Decree must be for respondent.